AO 106 (Rev. 04/10)  Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: _____

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

FILED

DEC 2 8 2021

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____,DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

A ONEPLUS cellular phone, bearing IMEI number: 990016803370442, currently in the custody of the DEA at 901 NE 122nd St., Oklahoma City

)
)
)
)
)
)

Case No.  M-21- 747 -P

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Western_____ District of _____Oklahoma_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 21 U.S.C. § 841 | Possession with Intent to Distribute Controlled Substances |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

EDDIE M. FISH, Task Force Officer,  DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/28/21

_____
*Judge's signature*

City and state:  Oklahoma City, Oklahoma

GARY M. PURCELL, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

The **TARGET DEVICE** is described as a ONEPLUS cellular phone, IMEI: 990016803370442. The **TARGET DEVICE**, which is depicted below, is currently locked, preventing investigators from obtaining specific identifying phone information such as model and serial number.  The **TARGET DEVICE** is currently in the custody of the Drug Enforcement Administration at 901 NE 122nd Street, Oklahoma City, Oklahoma 73114.



## ATTACHMENT B

All records on the **TARGET DEVICE** described in **Attachment A** that relate to violations of law, including 21 U.S.C. § 846 (Drug Conspiracy) and 21 U.S.C. § 841 (Possession with Intent to Distribute Controlled Substances). The items to be seized include:

a.  Stored communications which are voice recordings/messages, text messages (SMS) and multimedia messages (MMS), emails and attachments, read or unread which relate to and provide evidence of criminal activity described in this affidavit;

b.  Stored communications voice or text based located within downloadable messaging applications or social media applications;

c.  All internet usage history that may reveal evidence of drug trafficking or bulk cash smuggling, such as package tracking, internet mail communications, electronic payment receipts, etc.;

d.  Call logs/histories depicting incoming/outgoing numbers dialed to and from the **TARGET DEVICE** which relate to and provide evidence of the above described criminal activity and further described in this affidavit;

1

e.  Internet World Wide Web (WWW) browser files including browser history, browser cache, browser favorites, auto-complete form history and stored passwords;

f.  Contacts, address books and calendars, customer lists and related identifying information such as names, nicknames and/or monikers within the above described telephone device which relate to and provide evidence of the above described criminal activity and further described in this affidavit;

g.  Photographs, audio/video recordings with their associated metadata relating to and which provide evidence of the above described criminal activity and further described in this affidavit;

h.  Stored location information including global positioning system (GPS) data indicating coordinates, way points, tracks and locations in which the phone has traveled; and,

i.  Data and user records/information, password(s) that would assist in identifying/confirming the owner(s)/user(s) of the above referenced property to be searched.

2



## WESTERN DISTRICT OF OKLAHOMA

## OKLAHOMA CITY, OKLAHOMA

**STATE OF OKLAHOMA**          )
                              )
**COUNTY OF OKLAHOMA**         )

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Eddie M. Fish, a Task Force Office (TFO) with the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41.  I am also empowered by law to conduct investigations of, and to make arrests for, offenses as set forth in 18 U.S.C. § 2516.

2. I have been a TFO with the DEA since January of 2021.  I have also been employed as an Oklahoma State Trooper for twelve years, and I completed the 59th Oklahoma Highway Patrol Academy.  In completing the Academy, I received training in detecting criminal activity, including drug activity.  As part of my training, I have completed the Desert Snow training program, the longest running criminal interdiction training program in North America. From June of 2015 until April 2018, I was assigned to the

Oklahoma High Patrol Special Operations Unit for Criminal Interdiction and served as a K-9 handler. During this time, I was involved in hundreds of interdictions stops and custodial interviews. Through my training and experience, I have become familiar with the methods and operation of drug distributors, including their common organizational structures, use of violence, methods of distributing, storing, and transporting drugs, and methods of collecting and laundering drug proceeds. During my employment in law enforcement, I have received training and conducted investigations related to drugs, drug distribution, and conspiracy involving the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I have participated in many aspects of drug investigations, including but not limited to: surveillance, search warrants, arrests, reviewing taped conversations and drug records, and debriefing defendants, informants, and witnesses who have personal knowledge about major drug trafficking organizations.

3. During my employment as a DEA TFO, I learned that individuals involved in drug-trafficking often do the following:

      A.    Traffickers in controlled substances frequently maintain, on hand, large amounts of U.S. currency in order to maintain and finance their ongoing illicit business;

      B.    It is common practice for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transportation, ordering, sale, and distribution of controlled substances; that the

aforementioned books, records, receipts, notes, ledgers, etc., are maintained for extended periods of time at a place where traffickers have ready access to them;

C.   It is common practice for drug traffickers to hide contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence, their vehicles, their business, or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

D.   It is common for persons involved in trafficking of controlled substances to maintain evidence pertaining to their obtaining, secreting, transferring, concealing, and/or expenditure of proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit keys, and money wrappers;

E.   These items are maintained by the traffickers within their residences, in safes, vehicles, businesses, or other locations over which they maintain dominion and control;

F.   That experienced, well-organized, drug traffickers often utilize electronic equipment such as computers, digital pagers, telex machines, facsimile machines, cellular telephones, electronic voice mail, and telephone answering machines to generate, transfer, count, record, and/or store drug related information or information related to drug proceeds;

G.   When drug traffickers amass large amounts of proceeds from the sale of drugs, they attempt to legitimize these profits through money laundering activities;

H.   To accomplish these goals, drug traffickers utilize including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals, such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency;

3

I.     The sale of controlled substances generates large quantities of U.S. currency in small denominations;

J.     It is common for drug traffickers to physically handle and count the monies after receiving it in exchange for the narcotics, thereby leaving residue traces of controlled substances on the monies;

K.     Drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

L.     Drug traffickers take, or cause to be taken, photographs and videos of themselves, their associates, their property and their product; that these drug traffickers usually maintain these photographs within their possession, in their residences, vehicles, businesses, or other locations which they maintain dominion and control over;

M.     Money launderers register multiple businesses which deal in cash transactions in order to filter the illegal proceeds;

N.     Oftentimes, these businesses are listed to drop boxes and the businesses themselves do not have a physical address;

O.     Experienced, well-organized, drug traffickers and their associates often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities, to avoid detection of these assets by law enforcement agencies; and although these assets are in other names, traffickers actually own and continue to use these assets and exercise dominion and control over them.

4.     The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure a search warrant for a ONEPLUS cellular phone, IMEI: **990016803370442** (the **TARGET**

**DEVICE**),[1] as described further in **Attachment A** (physical description), for evidence of violations of federal law, to wit: 21 U.S.C. § 846 (Drug Conspiracy) and 21 U.S.C. § 841 (Possession with Intent to Distribute Controlled Substances), as described further in **Attachment B** (description of items to be seized). The **TARGET DEVICE** is currently located in the custody of the Drug Enforcement Administration at 901 NE 122nd Street, Oklahoma City, Oklahoma 73114 (Western District of Oklahoma).

5. This Affidavit is based upon my personal investigation and upon information received from other law enforcement officers and agents and may not include all evidence or information available or of all facts known to me relative to this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrant.

## BACKGROUND REGARDING CELLULAR DEVICES

6.     Based upon my training and experience, I am aware:

A.     Individuals involved in trafficking illegal narcotics and bulk cash smuggling often use cellular phones to maintain contact with other co-conspirators, including suppliers, transporters, distributors, and purchasers of illegal narcotics and/or drug proceeds. Such cell phones and their associated memory cards commonly contain

---

[1] The **TARGET DEVICE** is locked and contains no visible serial number, thereby preventing investigators from obtaining specific identifying phone information such as model and serial number. Therefore, law enforcement is unable to describe the phone with further specificity and has included a photo of the **TARGET DEVICE** in **Attachment A**.

electronically stored information which constitutes evidence, fruits, and instrumentalities of drug trafficking and bulk cash smuggling offenses including, but not limited to, the phone directory and/or contacts list, calendar, text messages, e-mail messages, call logs, photographs, messaging applications, and videos.

B. Drug dealers and bulk cash smugglers often switch phones in order to avoid detection from law enforcement, and that drug dealers and bulk cash smugglers often have multiple phones that they use for different co-conspirators in order to separate their drug dealing and/or bulk cash smuggling.

C. Drug dealers keep old cellular telephones no longer in use in order to save telephone numbers of other co-conspirators, as well as other relevant information including text messages and photographs.

D. Individuals involved with sending/receiving controlled substances through the U.S. Mail will often utilize their cellular phones to access the internet in order to search for parcel tracking numbers and or to receive parcel tracking status updates identifying the arrival of suspect parcels.

E. Drug dealers and users oftentimes have stored photographs, videos and/or text and voice messages associated with the use and distribution of controlled dangerous substances and proceeds derived therefrom for their own records and/or for the purpose of furthering their distribution activity maintained on their cellular telephones and other electronic handheld devices.

F. Drug distributors/consumers and bulk cash smugglers will often use coded words and phrases and vague references in order to discuss their plans and prevent anyone from overhearing their conversations and from recognizing that the conversations concern a criminal conspiracy.

G. Prospective drug purchasers, recipients, and/or users will often telephone the drug distributor to obtain permission to come to the distributor's location *i.e.* his business, residence, *etc.*, to obtain the drug; similarly, bulk cash smugglers will often telephone their co-conspirators to coordinate the delivery of the bulk cash proceeds to be smuggled.

H. Drug distributors will often have "sales people" bring prospective drug purchasers to him or her and these sales people will receive payment in cash, or in kind (a quantity of drugs), for bringing drug users/buyers to the distributor. These "sales people" often use the telephone to contact the distributor by voice or text message to arrange these meetings.

## PROBABLE CAUSE

7.      A months-long DEA investigation has identified a major cocaine and methamphetamine trafficking organization—the Baeza-Medrano DTO ("the DTO")—which is headquartered in Oklahoma City and which is distributing hundreds of kilograms of methamphetamine and cocaine throughout the state of Oklahoma and elsewhere.   Information developed during this investigation indicated that there were several Oklahoma-based associates of the DTO, including **Juan Luis Lopez-Carreon (LOPEZ-CARREON)**—the user of the **TARGET DEVICE.**

8.      For example, on April 20, 2021, as part of the investigation into the Baeza-Medrano DTO, law enforcement in Tulsa, Oklahoma, was tracking the movements of Alexis Perez-Camacho (PEREZ-CAMACHO), whom they believed would be transporting cocaine from Oklahoma City to Tulsa to conduct a drug deal.   At approximately 5:06 p.m., law enforcement observed PEREZ-CAMACHO's Chevrolet Cruze pull into the strip mall parking lot at 1100 E. 31st St. in Tulsa.  Also observed in the parking lot was a tan Honda Odyssey bearing Oklahoma tag LGZ344—which law enforcement identified as being registered to

Reinaldo Gustavo-Martinez (GUSTAVO-MARTINEZ) at 12821 E 13th Pl., Tulsa, Oklahoma.  Parked directly next to GUSTAVO-MARTINEZ was a black Ford F-150 with a temporary license plate, which law enforcement observed to be driven by Manuel Gustavo Cardenas-Lozoya (CARDENAS-LOZOYA)—whom law enforcement knew to be a Tulsa-based associate of the DTO.  As PEREZ-CAMACHO's Cruze parked in the lot near the Honda Odyssey and the Ford F-150, law enforcement observed CARDENAS-LOZOYA enter the rear passenger seat of the Cruze. At approximately 5:08 p.m., law enforcement observed CARDENAS-LOZOYA exit the rear passenger seat of the Cruze and enter a business north of where the Cruze was parked. Next, at approximately 5:16 p.m., CARDENAS-LOZOYA exited the business, carrying a small unidentified object in his hands, and returned to the Cruze. At approximately 5:17 p.m., CARDENAS-LOZOYA exited the Cruze and returned to his F-150 and departed the parking lot. A few minutes later, at approximately 5:20 p.m., law enforcement observed GUSTAVO-MARTINEZ exit the business and enter the driver's seat of the Honda Odyssey and depart the parking lot as well.  At approximately 5:28 p.m., law enforcement conducted a probable cause traffic stop with the Honda Odyssey for an improper lane change at 10100 E. 11th St., Tulsa, Oklahoma.  GUSTAVO-MARTINEZ was the sole occupant of the vehicle. During the traffic stop, the officer observed a plastic wrapped bundle on the

8

driver's side floorboard of the vehicle, which he believed to be an illegal substance in plain view, based on his training and experience. A probable cause search of the vehicle revealed approximately one pound of a brick of white substance believed to be powder cocaine in the vehicle. A field test was later conducted and resulted presumptive positive for cocaine. GUSTAVO-MARTINEZ was arrested and booked into the Tulsa County Jail for state cocaine trafficking charges without incident. It should be noted that at approximately 5:22 p.m., shortly before law enforcement pulled over GUSTAVO-MARTINEZ's vehicle, electronic surveillance showed PEREZ-CAMACHO's Chevrolet Cruze leaving the strip mall parking lot. Law enforcement observed the passenger of the vehicle to be **LOPEZ-CARREON**. Based on my training, experience, and knowledge of the investigation, I believe that **LOPEZ-CARREON** traveled with PEREZ-CAMACHO from Oklahoma City to transport the cocaine for the deal.

9. In the months following this deal, the investigation would establish that the DTO was using a residence located at 9601 S. Indiana Ave., Oklahoma City, Oklahoma (the "Indiana Residence")—to store drugs. The Indiana Residence belonged to Maria Julia Baeza-Medrano (JULIA) and her sons Jesus Ivan Baeza-Medrano (IVAN) and Carlos Aaron Baeza-Medrano (AARON). On the morning of October 26, 2021, JULIA, IVAN, and AARON were subject to a

traffic stop by law enforcement shortly after leaving the Indiana Residence. A probable cause search of the vehicle resulted in law enforcement recovering approximately 22.85 kilograms of methamphetamine and approximately 3.28 kilograms of cocaine from their vehicle. In response to this information, law enforcement obtained and executed a search warrant for the Indiana Residence later that day. During the execution of that warrant, law enforcement seized approximately 9.5 kilograms of cocaine, 4 kilograms of methamphetamine, two firearms, and approximately $192,692.42 from the Indiana Residence.

10.     This investigation involved Title III wiretaps, and one of these wiretaps—over PEREZ-CAMACHO's telephone (TT4)[2]—helped further corroborate **LOPEZ-CARREON's** involvement in the DTO. Based on calls intercepted over TT4 on October 26, 2021, investigators believe that news of AARON, IVAN, and JULIA's arrest earlier that day had reached PEREZ-CAMACHO. For example, at approximately 4:52 p.m. PEREZ-CAMACHO, using TT4, placed an outgoing call to **LOPEZ-CARREON** at telephone number (405) 764-3957 (TT4 Ref. # 1497). During this conversation, **LOPEZ-CARREON** advises PEREZ-CAMACHO that "Roy"—whom investigators know to be Ivan

---

2     On September 27, 2021, the Honorable David L. Russell, United States Chief District Judge for the Western District of Oklahoma, signed an order pursuant to 18 U.S.C. § 2518, *et seq.* authorizing the interception of wire and electronic communications over (214) 909-5101, used by PEREZ-CAMACHO.

Roy Gonzalez-Hernandez (ROY)—wanted him to pick up "70 pesos" at "Julia's house."    PEREZ-CAMACHO then tells **LOPEZ-CARREON** that law enforcement would be hitting that house because they (JULIA, AARON, and IVAN) had everything under that "house's name." PEREZ-CAMACHO then tells **LOPEZ-CARREON** that "Chuy" had asked him to find someone to go pick up the "work" at "49th" and that "Golo" (Jose Dominguez) knew its location. **LOPEZ-CARREON** asked if that would be more difficult, and PEREZ-CAMACHO said no, because nobody knew about the house on 49th.

11.    Based on my training, experience, and knowledge of the investigation, I believe that in this call, PEREZ-CAMACHO was asking **LOPEZ-CARREON** to go pick up $70,000 ("70 pesos") that would be at the Indiana Residence.   He also tells **LOPEZ-CARREON** that "Chuy" needed someone to go pick up drugs (the "work") from the 49th St. Residence and that would be less risky.  All of this was consistent with what investigators knew at that point.  First, "Chuy" is an individual based in Mexico who throughout the investigation has directed the DTO's activities.  Second, investigators knew that the DTO was also using a house on SW 49th St.—namely 1108 SW 49th St., Oklahoma City—as a drug stash house.  Finally, law enforcement knew that "Chuy" had ordered PEREZ-CAMACHO to move to Indianapolis on behalf of the DTO, so it made sense that PEREZ-CAMACHO himself was not in Oklahoma

11

City to check the house on 49th St.   In short, I believe that the DTO was attempting to move cash from JULIA's house on Indiana Ave. and drugs from the house on 49th St.—which PEREZ-CAMACHO did not believe law enforcement knew about.

12.    It appeared that the DTO attempted to move drugs out of the house on SW 49th St.  While executing the search warrant at the Indiana Residence, law enforcement had observed a dark colored Jeep Grand Cherokee in the vicinity of the Indiana Residence, which was notable because law enforcement had previously identified a dark colored Jeep Grand Cherokee belonging to ROY. Moments later, law enforcement observed ROY's dark colored Jeep Grand Cherokee bearing Oklahoma License plate SRT-ROY park on the street in the area of 1108 SW 49th Street.  Shortly thereafter, law enforcement observed an individual wearing an orange shirt, later identified as ROY, and a second Hispanic male, walk to the front porch of 1108 SW 49th St.  Law enforcement then observed both individuals walk around to the rear of the residence. Not long after, at approximately 7:09 p.m., law enforcement observed ROY and the other Hispanic male walk back to the Jeep Grand Cherokee and depart. Law enforcement, however, was unable to maintain surveillance on ROY's Jeep Grand Cherokee. Around the time ROY and the other Hispanic male had left the 49th St. Residence, Oklahoma City Police Department (OCPD) dispatch received

a call reporting that a subject was attempting to break into the 49th St. Residence and that the subject departed in a Jeep Grand Cherokee.

13.    At approximately 7:15 p.m., OCPD then responded to the 49th St. residence and observed the back windows broken out of the residence. While conducting a protective sweep of the residence to determine that no individuals were inside, law enforcement observed pallet jacks propped on the rear door, a safe in a closet, and a rifle box.

14.    Law enforcement was able to eventually locate ROY's Jeep Grand Cherokee at DOMINGUEZ's residence at the Hillcrest Apartments, located at 1402 SW 59th Street, Oklahoma City, Oklahoma. At approximately 7:50 p.m., law enforcement observed ROY and DOMINGUEZ exit the apartments and enter DOMINGUEZ's Chevrolet Cruze and depart the apartment complex. Surveillance was maintained on the Cruze. Then, at approximately 8:02 p.m., law enforcement observed the Cruze arrive at the 49th St. Residence. Law enforcement then observed an individual exit the Cruze and walk towards the front door next to the 49th St. Residence.  Shortly thereafter, the individual walked back towards DOMINGUEZ's Cruze, and the vehicle departed the area.

15.    Not long after, at approximately 8:09 p.m., law enforcement conducted a traffic stop in the area of the 49th St. residence on the Cruze for a traffic violation.  The occupants of the vehicle were identified as ROY and

DOMINGUEZ. Police issued a warning to the two occupants and they were released from the scene without incident.

16.     Based on calls over TT4, it appears that **LOPEZ-CARREON** and ROY had in fact attempted to break into the 49th St. residence earlier that night and that ROY, in a second attempt with DOMINGUEZ, had attempted to return to the house to retrieve the DTO's stash of drugs. At approximately 8:25 p.m. that night, PEREZ-CAMACHO used TT4 to place an outgoing call to **LOPEZ-CARREON** (TT4 Ref. # 1522.) During the call, **LOPEZ-CARREON** tells PEREZ-CAMACHO that he (**LOPEZ-CARREON**) and ROY had gone to the house on 49th St. but had left after a neighbor heard **LOPEZ-CARREON** breaking a glass. **LOPEZ-CARREON** stated that he was no longer with ROY.

17.     Then, roughly fifteen minutes later, at approximately 8:40 p.m., **PEREZ-CAMACHO** made another call to **LOPEZ-CARREON** (TT4 Ref. # 1523). During the call, PEREZ-CAMACHO tells **LOPEZ-CARREON** that "Chuy" told him that ROY had been stopped by the police. **LOPEZ-CARREON** then explains that after they (he and ROY) had left the house, ROY wanted to go again, but **LOPEZ-CARREON** did not want to go because his hand was cut from the broken glass. **LOPEZ-CARREON** continued, explaining that ROY had wanted to return to the house to pick up the "devices" and that he had taken "Golo" (DOMINGUEZ) with him.

14

18.     Based on my training, experience, and knowledge of this investigation, I believe that the events described above further corroborate that the DTO was using 1108 SW 49th as a stash house, and that ROY and **LOPEZ-CARREON** had first attempted to break into the stash house but had left after a neighbor heard them breaking glass.  This was consistent with the 911 call that OCPD dispatch received.  I also believe that ROY and DOMINGUEZ then returned to the house one more time, presumably because they had not been able to move drugs out of the 49th St. residence during their first attempt.  That it had been ROY and DOMINGUEZ that had attempted to return to the house the second time seems to have been corroborated by law enforcement's identifying both men after they pulled ROY's vehicle over for a traffic violation, as well as the call described above.

19.     Late that evening, law enforcement obtained a search warrant for the 49th St. Residence.  In the southeast bedroom of the 49th St. Residence, law enforcement located one package, wrapped in black tape, which had an approximate field weight of 1,462.1 grams and has since tested positive for fentanyl.  In the northeast bedroom of the 49th St. Residence, law enforcement recovered a plastic bag containing a white powder substance, which had an approximate field weight of 1,126.7 and which field tested positive for cocaine. In short, I believe based on my training, experience, and knowledge of the

15

investigation, that the DTO was in fact using the house at 1108 SW 49th St. and that **LOPEZ-CARREON** attempted to break into the residence with ROY on behalf of CHUY and the DTO.

20.     Finally, on November 28, 2021, law enforcement filed a criminal complaint charging **LOPEZ-CARREON** and others with a drug conspiracy, in violation of 21 U.S.C. § 846.   When officers arrested **LOPEZ-CARREON** on November 30, 2021, they conducted a search incident to arrest of his person and recovered the **TARGET DEVICE**.   Subsequent to this, law enforcement obtained a federal search warrant for his residence, located at 3221 SW 103rd Pl., Oklahoma City, Oklahoma.   (During processing at DEA, **LOPEZ-CARREON** identified this as his residence.) The execution of that search warrant yielded over 200 gross grams of cocaine.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.   This information can sometimes be recovered with forensics tools.

   a.     *Forensic evidence.* This application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic

evidence that establishes how the device was used, the purpose of its use, who used it, and when.

b.   *Nature of examination.*  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

c.   *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## MANNER OF SEARCH

22.   I would note that based upon his aforementioned training and experience, relevant and/or incriminating text messages, videos, and photographs oftentimes are comingled on cellular telephones and electronic handheld devices with text messages, videos, and photographs which do not have an evidentiary value.  However, criminals engaged in communications furthering the nature of their criminal enterprise, in particular with investigations involving the use/distribution of controlled dangerous substances, many of these communications will involve cryptic/guarded and or otherwise coded jargon which is oftentimes utilized to conceal the nature of their illegal communication.  As a result, a limited review of the content of each communication will be necessary to determine the nature of the

communication and whether it is relevant to that information particularly set forth above within this Affidavit.

23.     Searching the electronic handheld device for the evidence described above may require a range of data analysis techniques.  In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  For example, agents may be able to execute a "keyword" search that searches through the files stored in a computer for special words that are likely to appear only in the materials covered by a warrant.  Similarly, officers may be able to locate the materials covered in the warrant by looking for particular directory or file names.  In other cases, however, such techniques may not yield the evidence described in the warrant.  Criminals can mislabel or hide files to evade detection; or take other steps designed to frustrate law enforcement searches for information.  These steps may require officers to conduct more extensive searches, such as scanning areas of the device's memory not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your affiant requests permission to use whatever

data analysis techniques necessary and available to locate and retrieve the evidence described above.

## AUTHORIZATION REQUESTS

24.     Based on the above information, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846 have occurred, and that evidence, fruits, and instrumentalities of these offenses are located on the **TARGET DEVICE**. Specifically, law enforcement's investigation of **LOPEZ-CARREON** revealed that he is involved in a drug trafficking conspiracy.   Therefore, I respectfully request that this Court issue a search warrant for the **TARGET DEVICE**, described in **Attachment A**, authorizing the seizure of the items described in **Attachment B**.


EDDIE M. FISH
Task Force Officer, DEA

Sworn and subscribed to before me this 28th day of December 2021.


GARY M. PURCELL
United States Magistrate Judge
Western District of Oklahoma

19

## ATTACHMENT A

The **TARGET DEVICE** is described as a ONEPLUS cellular phone, IMEI: 990016803370442. The **TARGET DEVICE**, which is depicted below, is currently locked, preventing investigators from obtaining specific identifying phone information such as model and serial number.  The **TARGET DEVICE** is currently in the custody of the Drug Enforcement Administration at 901 NE 122nd Street, Oklahoma City, Oklahoma 73114.



### ATTACHMENT B

All records on the **TARGET DEVICE** described in **Attachment A** that relate to violations of law, including 21 U.S.C. § 846 (Drug Conspiracy) and 21 U.S.C. § 841 (Possession with Intent to Distribute Controlled Substances).  The items to be seized include:

a.    Stored communications which are voice recordings/messages, text messages (SMS) and multimedia messages (MMS), emails and attachments, read or unread which relate to and provide evidence of criminal activity described in this affidavit;

b.    Stored communications voice or text based located within downloadable messaging applications or social media applications;

c.    All internet usage history that may reveal evidence of drug trafficking or bulk cash smuggling, such as package tracking, internet mail communications, electronic payment receipts, etc.;

d.    Call logs/histories depicting incoming/outgoing numbers dialed to and from the **TARGET DEVICE** which relate to and provide evidence of the above described criminal activity and further described in this affidavit;

e.    Internet World Wide Web (WWW) browser files including browser history, browser cache, browser favorites, auto-complete form

1

history and stored passwords;

f.    Contacts, address books and calendars, customer lists and related identifying information such as names, nicknames and/or monikers within the above described telephone device which relate to and provide evidence of the above described criminal activity and further described in this affidavit;

g.    Photographs, audio/video recordings with their associated metadata relating to and which provide evidence of the above described criminal activity and further described in this affidavit;

h.    Stored location information including global positioning system (GPS) data indicating coordinates, way points, tracks and locations in which the phone has traveled; and,

i.    Data and user records/information, password(s) that would assist in identifying/confirming the owner(s)/user(s) of the above referenced property to be searched.